Appeals 1577 and 1578 from 2008, Yorkey v. Diab. Just to keep this simple, I'd like to have counsel argue all issues in both appeals. So we just have one principle argument, one response, and one rebuttal covering all four of the issues. Thank you, Mr. Morgan. Welcome. Please proceed. Thank you, Your Honor. Good morning. What I'd like to address first is the issues in the 1577 appeal first, Your Honor. And I would like to start discussing some of the issues with respect to the reduction to practice conclusion of the Board. The first of these I'd like to discuss, Your Honor, is the issue of the hospital data. There were two sources of data used in the intensity signal processing software for the reduction to practice. Data taken in hospitals from patients and data taken by Mr. Baker himself. Now, there's no issue about the data taken by Mr. Baker. No issue about that that it met the counts of requiring two discrete wavelengths and had motion components. And there should never have been, with all due respect, any issue about the hospital data, and Diab certainly didn't raise any issue about that data. The Board raised the question of whether the hospital data had two discrete wavelengths and had motion components. Well, Your Honors, it had to have. It had to have two discrete wavelengths to even be processed by the software. And both Yorkie and Baker testified to that. They testified that they had the two types of data. They testified that the software was written for and used two intensity signals, red and infrared light. In fact, after stating that the two types of data were used, Yorkie and Baker pointed out in their declarations and to the Board, the statement in the software itself specifying the LED, light-emitting diode, structure required for the data as red and infrared light. For Yorkie, that's at A1551, for Baker, 3631. Both specify, and I can quote it. They say, further in this code, and this is the code that processes the data they were using, and they did not draw any distinctions at all between the two types of data and its processing. Further in this code, the electromagnetic radiation of two or more wavelengths is set forth as follows. And then it says struct, as structure, LED, long, wavelength, infrared, red, and other. The IR they stated refers to the infrared wavelength being processed, and the red refers to the red wavelength. Where are you reading from, Joseph? I'm reading from their quotation at A1551, that's Yorkie, and Baker, A3631. They are quoting from the software code itself, those comments. The very next thing they point out is where the code takes the logarithms of each of the two intensity signals. That's what they told the Board, that's what they said in their declarations. That's in paragraph 33 of Yorkie, A1551-2, and paragraph 15 of Baker, that's A36031. And they again stated that the code also sets forth taking the logarithm of each representation, each representation of the first and second intensity signals. And they quoted from the code, the lines of code, that take the logarithms of the two red and infrared intensity signals. And throughout the code, the software variables are identified as red and infrared. But the Board itself indicated that the data that Mr. Baker submitted was not complete, right? I don't believe so, Your Honor. Did they say specifically that there were only two lines of the code that were submitted and the rest were not? I'm trying to figure out the total submission that was being done by Mr. Baker. To some extent, I believe that was a misunderstanding by the Board. There was significantly more submitted. Well, if it was a misunderstanding, let's try to clear it up, because that's a very important issue. It is an important issue. There is much more than two lines of code. What they cited, Your Honor, was the code which carries out the steps of the count and the method. That's what they cited. And they quoted it. And there's a lot of code there. And as they also explained, what they did was they were trying to compare Yorkie's method to other methods that were being developed, as well as to the original N200 Nelker-Oxenberg method, so that the code had code for each of those. And they explained what they did. Because they're talking about the count here, which is the Yorkie invention, they isolated the code that carried out the steps of the Yorkie invention. With the two inputs. Yes, Your Honor, with the two inputs. And that's what it has. In fact, all of them have. To put it simply, Your Honor. Well, we'll get to the other one, because the other one really has three signals, right? That's the other. And that we do not contend was reduced to practice at that time. But the count requires two. And, in fact, the count includes at least two, because claim two of Yorkie, which is set to correspond to the count, says at least two. But the simple fact is, Your Honor, they knew what that software was. They knew what the data was. Who's they? Yorkie and Baker, Your Honor. And that's why they testified as to what it was. Baker himself testified that he observed the plethysmographic waveforms of the data. That's the red and the infrared waveforms. That he observed that. And he testified the reason he observed that is so that he could identify, he's had years of experience in this, he could identify the locations of perturbations due to motion. So they could check and make sure that whether the method was working or not working at the points of motion. So whether somebody was at the hospital when the code was taken or not, the fact is they had, and how far away the data was taken, they had the data itself. They observed the data. They observed the waveforms of the data. They ran the data through their system, their code, which only works with red and infrared data. And it only works with movement? No, it works with and without movement, Your Honor. So that was one of the issues that the board did raise, that there was no indication of movement. No, what the board said is they didn't know about the hospital data. What we pointed out in our briefing, Your Honor, is that Mr. Baker, as I just said, testified the way he dealt with the motion is to observe the waveforms themselves. It looked kind of like a pulse monitor. The waveforms themselves, and you can observe with experience, you can observe and see where there are perturbations in that waveform that are due to motion noise. You can tell the aberration by reading the waveform itself? By looking at the waveform. And I don't know if you've been in a hospital lately. I'm afraid I have. And you can very quickly watch these waveforms, and you can very quickly, I mean, I've tried it because I happen to like dealing with proximity, you can wiggle your fingers around and you can see quickly where in the waveforms there's a motion. The motion is being picked up. That's exactly right. And the whole purpose of the invention is, despite that motion, to be able to come up with an accurate saturation calculation. I think that the court found the testimony with the two waves to be sufficient, but then there was the next assumption that was concluded without support in Mr. Yorkey's testimony as to how he reaches the final conclusion. And Mr. Yorkey said, for example, he wrote the software, so he based his assumptions on the amount of motion is the same at the time for each of the intensity signals for each wavelength, and that the motion components are proportional. He stated that, but the problem that the court had was that those assumptions, how they were implemented within the software, was just not put before the court. So the court couldn't just take his uncorroborated conclusion, much like you said today, which is essentially the proof's in the pudding, and reduce it to a conclusion. In fact, Your Honor, it was presented to the court, to the board, and it was presented in this way. Yorkey explained that the assumptions, those two assumptions that you spoke about, he said, I use those in my method, the way I incorporate those in my method, this is a testimony that was given to the board, in my method is by logarithmic converting the two signals, converting them to logarithms, and then differentiating, and the two signals are the ones that represent the basic equation, then differentiating the logarithms, and then doing a ratio metric calculation of saturation. And where is that in the software? Where is the testimony that shows that this was in the software? He showed exactly that. It is quoted in his declaration, the very software I'm talking about, was quoted in the declarations and cited to the board. He put that in there. What he said, and the point is, as he testified, the assumptions are built into this mathematics, and that's as follows. He explained that based on the assumptions, the assumptions are, at the same time I got the same amount of motion for each signal, and the motion as it appears in the signal itself is proportional between the two wavelengths. How is that then built into the equation in the mathematics? Because if you take the logarithms first, and then you differentiate the logarithms, what happens is that the rates of change of the motion in the two signals are the same. Are both of those signals converted to logs? Yes, you are. Or just one? Both. So if you have an assumption that there is noise and the noise is equal in both signals, you convert them to a log, and then you just sum them up. Then what you do is you can convert and differentiate, and that happens by taking the ratio-metric calculation, which is the red over the infrared ratios, which is how you do log-symmetric calculations. The two factors have now become equal for motion. But that's assuming that the noise ratio is the same in both signals. That's the assumption. And if it doesn't? It isn't. In fact, what he proved by then doing the test, is that by processing the signals on these assumptions, he actually got results that allowed him to get accurate calculations of saturation in the presence of motion, when the prior oximeter would get driven right off the charts. His stayed steady, and that's what both he and Baker talked about. So the assumptions are built into the mathematics, and that's what he testified to in his declaration. We'll even assume that, just for sake of argument, that that is correct. Then the board had an alternative ground, too, saying that it didn't implement the subtracting limitation. Actually, it's sort of just the opposite of what I made. What the board said was, okay, what you showed us doesn't have subtracting. What else is there? And the point there, Yorkie testified that his method, the method not only to concede, but the method that he developed in the actual oximeter, by using this logarithm differentiation ratio, no subtraction is needed, no subtraction is performed, because the motion cancels out. And what he did is he cited the code, which accomplished that. He pointed out that there's other code in there. There's other code for other systems in there. But what he did is he testified, I do it without subtraction because I've done the ratios, and he showed how you do the ratios. Now, did he go through each of the other lines of code? No, he didn't. To some extent, it's a little bit frustrating that in his reply declaration, which the board didn't consider, Diab had questioned where the red and infrared signals, they had no problem, that's what they were, where they were initialized in the code, so they could follow it. And he pointed out, he tracked the code all the way from the point the data, the red and infrared data is received, all the way through the calculation. So if they had taken a look at that, they would have seen there was no issue at all. But in terms of the a priori case, he testified, he explained why the code that he presented is the code that did the calculations and the processing, and why it gets rid of the motion without subtraction. Hypothetically, if the motion signals built in are different, say one is zero and one is one, would that work in the same manner? Obviously, if you go through the signals and you convert it to a log-log and then differentiate them out, the ratios, if they're different, then the assumptions are going to be different. Yeah, where the assumption comes in is because of the proportional, since they're proportional, that means the rate of change of each is the same. Even if, for example, one is larger than the other at the start, that's why you do the log and differentiation, by taking the logarithm first, and then differentiating, you are taking, in effect, a differential, which is the rate of change of the two. And the rate of change of the two, because of the assumption, is assumed to be the same. Now, if for some reason these assumptions weren't correct, he wouldn't have gotten the right answers. But he did get the right answers, because the assumptions were built into the software. And in fact, what I'm saying, because the assumptions were built into the software, if the assumptions weren't correct, they would come up with bad answers, but they came up with good answers. Turning, if I may, to the second part of this, Your Honor, and that has to do with Diab's lack, if I can move on to count two, Diab's lack of written description. I do, actually, I back up, I do want to make the point that this, I call it objection, whatever you want to call it, by the board to the hospital evidence. It came out of the left field. Diab didn't make it. And the point we want to get across is that totally aside from whether Mr. Baker had personal knowledge of the taking of the hospital data, he had knowledge, they both had knowledge, of that data, because they used it, looked at it, and put it into the software, which required it to be what the count requires. Now, let me ask you a question. If you lose on priority, does that mean that the entire aspect of the written description is then met at that point by Diab? No, Your Honor, it does not. You need to add 15 more minutes. For two counts, Your Honor. Count one was a priority issue, Your Honor. Count two was a separate issue. On the written description. That's correct, Your Honor. And that's separate and apart, different considerations, and it lives or dies on its own. But the 78 also has a written description issue. Yes, Your Honor. Which is totally separate, because you have different counts on that. Totally different invention. What about the priority issue on the 78? The 78 priority issue is not being appealed, only the written description aspect. Very good. If I may turn to the count two written description, what that count requires, there are two features which are important to our written description argument. The first is that, as we said, you log-convert the signals, so you have a logarithmic version. You differentiate the signals, so you have represented the signals as a differentiated logarithm of the total signal, which is the basic signal plus the noise. Now this is the method of the calculation, not the method of deriving how you get the method. This is the method of the calculation, of the measurement. You then express, you've got the signals, they come into your oximeter, and the oximeter then, the mathematics and the microprocess in the oximeter, express these signals, that have been logarithm converted and so on, express the signals in the form of a matrix, a mathematical matrix. And then, the method, the measurement method in the oximeter, solves that matrix. Now this matrix has terms for both signal and noise in it. Still limited to two signals. Yes, two signals. Solves that matrix by assuming that the signal and the noise components are independent, or uncorrelated. That there's no relationship between the two. One changes, the other doesn't have to, and vice versa. Now, Diob and the board relied upon two embodiments disclosed in Diob as supporting that count. The first method, we agree, provides a matrix. Not a question, not an issue. But, it solves the matrix. One of the reasons that Yorkley disclosed, by assuming it's zero, it makes solving the matrix very, very easy. Because when you solve the matrix in a lot of cross-multiplications, most of them fall out. And you come up with a very easy solution. What Diob does, is they don't assume zero correlation between the noise and the signal. But that's their second aspect, isn't it? The first aspect is trying to... the non-re-correlated signals? The first aspect, it does talk about minimally correlated. Minimally. And it refers to that first embodiment. Right. It does have a matrix, but they don't solve it by assuming there's no correlation. They solve it by finding the actual minimal correlation. They take 20 to 50 calculations to come up with it. But they do come up with it. They come up with it. Assuming that there's minimal correlation in the first embodiment. Assuming... They don't assume anything. They just say, we're going to do the matrix solution with the minimum correlation, whatever it happens to be. It may be zero, it may be 0.5, it may be 1. Right? It's whatever the minimal is. The minimal is defined, the actual correlation minimal is defined by the environment of what it's used in, of what the observer is using, what the motion noise is. For example, if I've got a heartbeat of 60, and the motion noise is at some tapping, or the noise also at 60 taps per minute, there's a correlation of virtually 1 between the noise and the signal. And that's the minimum correlation. And that's the minimal that's going to be calculated. But if the correlation is 0, which is their second alternative... Then we'll turn to that. And then it teaches a solution by matrix. Ah, it does not. With all due respect, Your Honor. Where do they fail to teach that? Okay. Where do they fail to teach it is that they, by their own expert, she says, well, there's a great deal of discussion in the briefing about whether the second embodiment incorporates the matrix of the first. We believe, we've sort of established that it doesn't. It's not a signal model. Matrix is a solution, not a signal model. But that's... Either way, however it comes out, it doesn't matter. But it strikes me as what you're having is dueling experts before the board. That's why I say it doesn't matter. And it doesn't matter for this reason. When you look at what Diab's expert said, Diab's expert acknowledges, and Diab acknowledges in their brief, that what is actually solved in the second method is not a matrix. What these signals are actually put into a representation is not a matrix. It's a Lagrangian maximum energy function. No, but it's Lagrange transformation, which gives you a constant, right? You're playing around with the lambdas. Pardon? You're playing around with the lambda constant. They're playing around. They come up with what is the maximum energy. Right. But, now, that's not a matrix. No, it depends on how you define a matrix at that point. Well, they admit in their briefing it's not a matrix, and their expert never tried to say it was a matrix. What the expert tried to say was, well, she believes that you derive through various steps. Starting with the matrix, you can derive a Lagrangian formula. First of all, you take the matrix. From the matrix, you derive a non-matrix, which is an energy equation. From the non-matrix energy equation, you derive a non-matrix Lagrangian formula. The point is, the count requires that in the operation of the microprocessor, in the operation of the device, count two, requires that the signals be represented in this logarithmic differentiated form, and be placed in a matrix, into a matrix, and that that matrix be solved. By their own expert's description of what happens, and by what's described in the disclosure, a matrix is never used in the actual method of calculation. Maybe somebody, in trying to come up with their method, started with working with a matrix to come up with a Lagrangian, but what's used in the method is the Lagrangian equation, not a matrix, admittedly not a matrix. So, does it meet the count? No, it doesn't. It does not meet the count. The consequence is, because there's no matrix, the signals are never put into a matrix, and the signals are never solved. The matrix is never solved. It is a different way, and perhaps an easier way, for all I know, of coming up with the answer. Where you don't solve a matrix, you don't create a matrix, you instead go to the Lagrangian maximum. So that, Your Honor, is count two. But, claim 16 of the 542 application, this is count two. Specifically talks about expressing the representations as a matrix. Yes, it does, exactly. And using the matrix to determine the RE factor by assuming an S and an N. That's what's required, Your Honor. Uncorrelated. That's what's required. And determining the saturation from the RA. That's exactly, Your Honor. And I don't dispute that's exactly what it calls for, and that's exactly what they don't have. They do not put the signals, forms, representations into a matrix, and they do not solve the matrix. They put them into a Lagrangian function, which is not a matrix, and they solve that. Is there an assumption of correlation zero? Sure, we don't dispute that. But what they don't do is the other parts of the claim, which is the matrix and the solving of the matrix. If I may turn, since I have about seven minutes real quick, to the other appeal, Your Honor. Really, our position here is straightforward. It's the same one we had before the board, and that is that Yorkie Claim 6, which is one of the claims course-lined to count, and D.O.B. 39 are just different inventions, start to finish. Yorkie Claim 6 claims a blood-measuring method in the presence of motions, and it uses three intensity signals. You have to have at least two just to do oximetry. It uses three. Each is represented as a function of saturation, and all three functions are solved. All three functions are solved. As Yorkie describes it, in fact, he puts it in his patent. He puts all three functions into a matrix and solves a three-function matrix. All three are solved. And there's some calibration issues. D.O.B. 39 claims a different invention. And the reason it does is because the only three-wavelength method of D.O.B. is a different invention. That three-method of D.O.B. is based upon D.O.B.'s noise-reference signal and correlation-canceler methodology, the same he uses for his two-wavelength system. In that three-method system, two of the signals are filtered to remove noise from them, and then saturation is calculated from those two signals, those two signal functions. Incidentally, that's exactly how two-wavelength systems work. Two signals and functions are used. Two are solved. Saturation is determined from the two. It's no different. In fact, the D.O.B. application describes its solution to fine saturation from two signals as being by quote known methods. So why does the third signal come in? The third signal comes in as part of the filtering. What D.O.B. has described throughout his application is a system in which you create a noise-reference signal. And from that noise-reference, you use that noise-reference signal, an entirely separate signal. You use that in a correlation-canceler with the other signals. But doesn't D.O.B. also teach the uncorrelated signal at that point? The correlated or uncorrelated is really not the issue here, Your Honor. This issue, this is going to, I'm sorry, I apologize, Your Honor. This is going to the next appeal, which has a different count. No, I understand. That count is not different. That's the count between Claim 6 and Claim 39. Yes, Your Honor. And correlation and uncorrelation is not an issue there. What is an issue at bottom is whether D.O.B. discloses solving all three functions or whether he discloses what we contend is simply using one of the signals to create a noise-reference. Using that noise-reference to filter the other two signals. And then obtaining saturation by solving the functions of the other two signals. In other words, he solves only two. That is our point. Now, nobody disputes on either side that that's how D.O.B. works with his three wavelengths. That's a given. Nobody disputes that. So the question is really does it solve three functions or not? And then we get back to our battle of the experts. Your Honor, with all due respect, not this time. Okay. Because the experts, if you read carefully, and even the board's decision, as well as Dr. Borat, who is D.O.B.'s expert, never gets around to saying that the third function is solved. What they do is they say, well, the use of the third signal to create a noise function is part a step in solving all three functions. But then they never get around to saying where is the third function solved? They say, well, we have the noise-reference, the approximation, and we have the filtering, and then we have the other two signals, and it's solved from that. So they say you're using the third signal in the process. Well, the fact of the matter is if that's the way you do these things, you're using everything that happens in the oximeter from the time the signal leaves my finger in the process. You're not solving all that, however. Well, Dr. Kosovic's testimony was that there was nothing in the interpretation of the Claim 39 which would cause one to make the leap to the conclusion that all three wavelengths were involved. And the Claim clearly states solving the three functions to obtain a value for saturation. Yes, the Count does. What Dr. Kosovic was dealing with there is there are two prongs to this point. The first is can you construe the D-OB claim to say solving three functions when it says solving the functions. And Kosovic there was directing to say if it doesn't say three, you wonder why. These people know what they're doing. They just say solving the functions. And he looks and he says why would you just say solving the functions rather than solving three? And you look back and he says I look back at their disclosure and I see why. They only solved two of them. So therefore, he says, I believe that this claim should be construed to say solving two. And if that's the case, then there is no interference in fact here between a solving three and a solving two. Alternatively, if, as the Board eventually said, if you say, well, we're going to look at the language solving the functions and we're going to read that since three functions are talked about must mean all three. If we're going to construe Claim 39 as solving all three, then our position is it's not supported. Because the disclosure doesn't solve all three. It only solves two. The disclosure uses a signal, one signal, for purposes of creating the noise reference and filtering the other two. And then it uses the other two signals to calculate saturation. Dr. Bohr herself, I think the reason she had a hard time walking up to it and saying that the three is solved as opposed to the third is used as a step. She said solving the functions means that the coefficients of the three functions are interrelated and that all three functions will be used to calculate the unknown coefficients of those functions. That's paragraph 29A524 of her declaration. There are no unknowns solved for the third function. Yet that third function is never solved. All you do is generate a noise reference signal from it which is not one of the unknowns in that signal. All it is is a reference that corresponds in frequency to what the expected noise in the other signals is going to be. So there is no solution made. And I believe my time is about up now. Yes, it is. We'll give you back some of your bubble time. Mr. Ray. Good morning, Your Honor. To put it bluntly, the Board did an absolutely stellar job in dealing with each of these, as you can see, very complicated and very technical arguments. Most of what Mr. Morgan just explained to you this morning is either a new argument, not of record, or in complete disregard of the Board's finding with regard to the issue that he was attempting to attack. Let's first understand with regard to the first count on the reduction to practice. In order for Yorkie to succeed, Yorkie would have to convince this Court that the Board committed legal error at least four times with regard to the reduction to practice. Or there's lack of substantial evidence. With regard... Now, we have a slight mismatch on the standard of review. They failed to even establish a prima facie case. So the substantial evidence standard is quite not applicable when there's a failure to establish a prima facie case. We will assume, for purposes of our discussion, that all of their evidence on the prima facie case is to be believed and accepted. They need to show legal error with regard to the Board finding missing elements or lack of evidence with regard to certain limitations. So it's really legal error is more appropriate with regard to count one. And so they really need to show legal error with the Board's conclusion that the prima facie case failed to establish the two assumptions which we just mentioned. The failure of the software to subtract motion. The fact that the input data did not have two different wavelengths to measure the patient oxygen saturation. And did that data also include the fact that the data the patient was moving at the time of the input. The Board's holding with regard to the data, not the software, is where the Board said there was a lack of personal knowledge by the declarants to even know what was included in the data. Now you're talking about Mr. Baker's declaration. And Mr. Yorkey's. Neither of them had personal knowledge with regard to the hospital data. That holding of the Board is not even attacked by Yorkey. And that is on page A-127. And for simplicity, I'm going to refer to the Board's opinion in the joint appendix, not in the blue brief because there's a mismatch in the page citations. The blue brief has the opinions but starts at page 1. But the joint appendix has the correct citation pages. So on A-127, the Board made a finding that is not challenged on this appeal by Yorkey. And that was there was no personal knowledge as to what was in the data. Did it really have did it really emanate from two wavelengths and did it include motion components? Now, Mr. Morgan came up here and is convincing trying to convince you that it includes those things. But the record doesn't reflect that. There was a failure of proof. The Board said nobody had personal knowledge. Now on appeal, that holding is not attacked. What is attacked? They argue that they should have been given a chance to fix that evidence. To supplement the record. In fact, the reply brief claims that it was a denial of due process for the Board not to allow them to fix it. That's an acknowledgement that the holding was correct and that they need additional evidence to meet out at least those two aspects of the claim. The first two limitations of the claim and that is two wavelengths including motion components. So the holding of the Board on A-127 is not attacked. Well, Appellant says it couldn't be anything else but the two wavelengths and the motion components. I'm sure Mr. Morgan could submit a declaration should we have the next interference. I have no reason to doubt his knowledge about these products. The trouble is the record doesn't have it. The Board doesn't know that. The declarants didn't explain that. And so what is the Board supposed to do when all they have now is arguments of counsel and no declaration. No personal knowledge stands unrebutted. And that would be unfair. Now, of course, the Board is allowed to raise a problem like lack of personal knowledge. Mr. Ray, you're assuming that the data that Mr. Baker submitted and analyzed, he had no personal knowledge at all on the submission of the data, the collection of the data. Is that required? He had no personal knowledge that it met the first two limitations of the count. As familiar as he thinks he was about the data from looking at the output charts, he gave some explanation, oh, it looks like it may by looking at the output. But that's because there was a deficiency in the proof with regard to what he knew on the input, the data. And there was no evidence of that at all. I'm not assuming anything. I'm just reflecting what the record shows. And the record shows a failure of proof. And the Board cannot be criticized for making a holding that they're entitled to make, sui sponte, regardless of whether or not we made that same objection, because there was a failure on the prima facie case. So our response to the prima facie case is really not relevant. It's that the prima facie case was defective right from the start. Only with respect to priority, right? With respect to priority on at least four grounds. We've only discussed the input data. The other problem, the main problem the Board found, is that there was no explanation as to how the software implemented the rest of the claim. The ADA methodology, as they call it. They explained in their conception about the ADA methodology. And they explained their conception implements the claim, the count one. Very good. And the Board doesn't take task, doesn't take them to task on the conception. But nowhere did they put that conception analysis and explain it in the actual reduction of practice, which is the software itself. And so most of the citations in the brief to this court by Yorkie are really citations to the conception evidence, not to the actual reduction of practice. So when you hear the explanation today or in the briefs, the explanation about this log differentiation and all this ADA methodology, all of that is really talking about the conception and not the actual reduction of practice. Quite frankly, Yorkie is totally unfair to the Board. And that's why Mr. That's my cheat sheet to keep my count straight. That's why I think you see Mr. Morgan not making any reference to the Board opinion. Nowhere did they show in the software the subtraction of motion. Nowhere did they show in the software motion to begin with, let alone the subtraction or without subtraction of motion. Well, would they be able to get a reading out without using the motion input? Oh, you'd get a better reading. Motion is the noise. Motion is the disturbance. No, I understand that. But you're talking about having the motion itself being taken out of the reading by the transformation of the two signals. Actually, the count language is without subtracting the motion, without removing it. So they needed to show how the software does not subtract the motion. And that they were unable to do. In fact, they didn't even explain the code. Which count is that? Count 1 in the first appeal, the 1577, failure to show actual reduction of practice. And so the board cannot be faulted for saying, Mr. Yorkey, you didn't give us any explanation of your software. How are we supposed to know where in the code it performs all these calculations? That, I don't see how this court could say that's an error as a matter of law. The board should have understood 36 pages of software. That would be a bit much. And so for that ground alone, there's no way Mr. Yorkey, the Yorkey party, could establish legal error on the actual reduction of practice. I'd like to move on to the written description of count 2 with regard to the Diab Claim 16. This is in the first appeal, count 2, Diab 16. That's why I need my cheat sheet. There's a lot of counts. There's three counts in the two appeals. In this appeal on count 2, the Lagrangian function argument you heard today, the board said it was untimely, was not considered, because it was only raised in the reply brief. So anything about Lagrangian was not presented to the board in a timely fashion. In count 2, with the written description, this is a substantial evidence question. This is the dueling experts. Here we have two experts butting heads over what the written description conveys to one of ordinary skill in the art. Obviously there's substantial evidence looking to the Bauer Declaration. Mr. Morgan obviously disagrees with what Dr. Bauer says. However, it certainly is substantial evidence. There's no question that there is a disclosure of the uncorrelated data. And the board said it's disclosed in the application four times. And that's in the board opinion. With regard to the matrix, now, here's where, particularly looking at the reply brief, this panel must be careful. And that is, it's DIOP 16 that we're talking about with regard to count 2. Not the Yorkie 3, which is what Mr. Morgan's entire argument reflected. These claims were not copied to form the count. So the written description issued before the court is DIOP 16, not Yorkie 3. The solving the matrix, that language is not in DIOP 16. That's the language in Yorkie 3, which is not at issue for purposes of the written description. So, Mr. Morgan was focusing on the wrong claim and he was not focusing on the language of DIOP 16, which is what the board was looking at for finding an adequate written description. And if there are no further questions, I'll move on to the second appeal. This is the appeal, 1578, the second appeal. There's one count and priority is not at issue. Here, the only questions are the motions. And the only motion that Mr. Morgan referred to today  the one dealing with interference in fact. Was the board correct in determining whether or not there was interference in determining that there was an interference? They're saying there shouldn't have been an interference and the board's claim construction was unreasonable. We did have a little mismatch on the standard review with regard to the claim construction on this appeal, but it appears in the reply brief they seem to now agree the standard review on claim construction from the board is not de novo. It's, was the construction reasonable? And their argument was it wasn't reasonable that the claim should have been construed more narrowly to have two functions plus an approximation step rather than three functions as set forth in the Yorkie claim. There's one major problem with the second appeal and it's issue number two of our red brief. Issue number two of our red brief is dispositive of this appeal. And issue number two points out that regardless of the claim construction of D.O.B. 39 regardless doesn't substantial evidence support the board's determination of an interference in fact because Yorkie never challenged the claim construction of Yorkie claim six. Yorkie claim six covers and therefore meets the two way test for an interference. It covers D.O.B. 39 regardless of the construction of D.O.B. 39. Their appeal did not appeal the board's holding that the Yorkie claim covers the D.O.B. claim regardless of the claim construction. Mr. Ray, how do you answer Mr. Morgan's statement regarding the three signals in the matrix calculation which is done in the 78 counts? Well, back to the dueling experts, our expert explained that both embodiments or the further implementation and embodiment one, both of those use a matrix. And in fact, what the board held, if the board was standing here, they would say to Mr. Morgan, you offered no evidence how the calculation could be done without a matrix. The matrix is assumed throughout the specification. It's fully explained. There's no... Were three signals? Oh, that's a different... The three signals... Solving the matrix, the language of Mr. Morgan, is not in D.O.B. 39. That, again, is going to the wrong claim. That's Yorkie. The solving the matrix language, he's already in the wrong claim. So... Claim 39 is from the application, right? Claim 39 is the D.O.B. 39, which is the one we're supposed to be looking at for determining written description. So, to be fairness to the board, we have to use the language of the right claims pertaining to the right count. And I realize this is a little thick, but the board's analysis goes through each of these holdings in great detail. And the point I'm making now with regard to the second appeal, which is the easy way, is if Yorkie covers the claim, under either claim construction, even if it's just two signals and an approximation step, if Yorkie covers it either way, and you didn't challenge the Yorkie construction, we're done. There has to be an interference. In fact, that holding is on A-64 in the second appeal. And it's a pretty detailed analysis on A-64. And here, the board concludes and says, as Dr. Bauer testified, the step of approximating the first and second signals is a step in the process of solving three functions. And, instead of excluding such an approximation step, Yorkie's claim, when properly construed, embrace it. And this is the end of the analysis on page A-64 from lines 6 through 25. Not appealed. Not challenged. Therefore, no matter how you construe the D-OB claim, Yorkie still covers it. Yorkie doesn't exclude the narrower claim. The Yorkie claim, claim 6 of the patent, which is the interference count, right? The second appeal, well, the claim... You have claim 6 and claim 39 in that count. Correct. Now, if, in fact, claim 6 is a three-step, right? Solving the three functions to obtain a value to the saturation. Whereas the claim 39 shows solving the functions to obtain a value of the saturation. The function that you're using is 2, not 3. No, we use all three, and if you go to my red... But you have a third function that comes in only as a feedback function, from what I understand of it. I would... Page 10, I did a diagram explaining how the three functions are used to calculate saturation. That, the language is, I just... In this claim, you just need to use the three functions to calculate saturation. So there is a slight difference... What is that third function? Well, if you look at the third... It takes the third function and the second function, creates a noise reference signal, and then takes... That's on page 10. Page 10 of the red brief. You can see the two functions, third function and the second, creating a noise reference signal. But you're getting a... oxygen saturation out of two functions, the first and the second. Not the third. The third looks like it's a feedback control factor. I'm not familiar with that language in the record. It's referred to as an approximation step or reference signal. It's a reference signal. It's a feedback signal. Okay, I'll take your word for it. Whatever. And... And it shows this is, according to the evidence, Dr. Bauer says, that in fact is the use of all three functions. And all... The evidence shows that that is the same thing as doing them in series or simultaneously or directly, which was their argument before the board. Before the board, their argument was a little different. Before the board, their argument was that you needed to do them all simultaneously or directly. Because they're... And now, they've backed off from that. The question is, do we use all three functions to calculate saturation? Absolutely. There's a declaration on that from our expert. I don't see how we can just disregard the expert declaration under these circumstances. So... But regardless... But regardless... Regardless of how it's construed, whether it's two functions or three, even if Dr. Bauer didn't even submit a declaration, in light of the claim construction on A64 of Yorkie 6, which is not challenged, that's dispositive. Because you still meet the two-way test. You still could proceed with the interference. Priority's not challenged. So therefore, the board was correct in finding an interference, in fact, with this Motion 2 in the... And that analysis is on A58 through concluding with A64. And the conclusion on A64 is the alternative holding saying, you lose either way, Yorkie, because your claim doesn't exclude using two functions plus a feedback or a reference. You still lose. So if you really go to the board's opinion in both of these appeals, it's thorough, there's belts and suspenders, and the board should be commended, hardly reversed under these circumstances. If there's no further questions... There is a meeting of the two-way test. There is a meeting of the two-way test. By definition, when the board says that the Yorkie claim embraces either construction on A64, which isn't even challenged on this appeal. So the second appeal, in my mind, on the interference in fact issue, never got off the ground in light of the failure to challenge the Yorkie construction on A64. Mr. Morgan did not address the backup alternative argument made in his brief with regard to the written description in the second appeal. Again, the board found not even a prima facie case on that written description. That's Motion 1 before the board. That analysis is on A57-58 and there's no error shown and wasn't addressed in this argument. If there's no further questions, I conclude. Thank you. Mr. Morgan? Yes, Your Honor. Thank you very much. I'd like to start with that last point. I'd like to read what the board said on A64. The board didn't say that we don't exclude Diob's way of solving 3. All the board said is that Yorkie's claim does not exclude the approximation step recited in Diob's claim. There's no dispute about that. It doesn't dispute. It doesn't exclude it. You can always do an approximation. You can do filtering in every system. You can always have an approximation step so long as you then solve all three functions. So the board wasn't saying there's two-way anticipation or obvious here in this point. What the board was saying was what we can all recognize from patent law that you could add an approximation step to Yorkie but you still got to solve all three functions. It wasn't saying that somehow the approximation step is the solving of the three functions. That was not the point. That was not what the board said. That doesn't support any two-way obviousness. I also want to point out I believe counsel and I must have been reading the wrong claims because I was reading claim 39. I've got it right here. The one about the matrix. Claim 16. Pardon me. I thought I heard counsel say that it doesn't have a matrix in it. I'm looking at A104 the board's opinion which sets out the claims and it says under claim 16 expressing said representations as a matrix and using said matrix to determine R sub A and so on. So it plainly does. I think there must be some confusion at that point. In terms of was the board shown the steps in the code? Absolutely. Those pages I cited to you from the declarations actually quote the portions of the code that carried out the steps. And finally, your honor I think you may have heard on the head Judge Gajarza what the board said was that Yorkie and Baker didn't have personal knowledge of the taking of the data in the hospital. They proved beyond a shadow of a doubt that they had personal knowledge of what the data was when they used it. Thank you very much. All right. We thank both counsel. The appeal is submitted.